IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION

| | | |
|---|---|---|
| Stacy A. Bolton, | ) | C/A No.: 1:12-3028-DCN-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Carolyn W. Colvin, Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civil Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Insurance Benefits ("DIB"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be reversed and remanded for further proceedings as set forth herein.

I.    Relevant Background

A.    Procedural History

On November 16, 2006, Plaintiff filed an application for DIB in which she alleged her disability began on May 31, 2006. Tr. at 93–95. The same day, she amended her onset date to January 1, 2006. Tr. at 91. Her application was denied initially and upon

reconsideration.  Tr. at 4A–5.  On July 16, 2009, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Gregory M. Wilson.  Tr. at 27–57.  The ALJ issued an unfavorable decision on January 28, 2010, finding that Plaintiff could return to her past relevant work ("PRW") as a stocker and was not disabled within the meaning of the Act.  Tr. at 9–21.  On November 9, 2010, the Appeals Council remanded the case to the ALJ for further review.  Tr. at 496–97.  The Appeals Council directed the ALJ to obtain supplemental evidence from a vocational expert ("VE") to clarify the demands of Plaintiff's PRW and how Plaintiff's assessed limitations impacted her occupational base.  Tr. at 497.  The ALJ held a second hearing on March 7, 2011.  Tr. at 582–613.  On April 27, 2011, the ALJ issued a second unfavorable opinion, finding that Plaintiff was not disabled within the meaning of the Act.  Tr. at 476–93.  Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review.  Tr. at 460–62.  Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on October 19, 2012.  [Entry #1].

      B.    Plaintiff's Background and Medical History

          1.    Background

Plaintiff was 43 years old at the time of the second hearing.  Tr. at 589.  She obtained her graduate equivalency diploma.  *Id.*  Her PRW was as a cashier, stocker, waitress, and filer.  Tr. at 590–93, 604.  She alleges she has been unable to work since January 1, 2006.  Tr. at 91.

2.    Medical History

a.    Records After Alleged Onset Date

On February 8, 2006, Plaintiff met with Dr. Daniel Caddell, her primary care physician.  Tr. at 422.  Plaintiff reported that she had experienced back pain since the previous Friday and had fallen down the stairs seven years previously.  *Id.*  She also had a history of a torn left anterior cruciate ligament ("ACL"), which was reconstructed with a cadaver ligament.  *Id.*  Dr. Caddell diagnosed Plaintiff with acute back pain, leg pain, and sinusitis.  *Id.*

On April 17, 2006, Plaintiff visited the emergency department complaining of pelvic pain and spotting.  Tr. at 391.  An ultrasound revealed what may have been an extremely early pregnancy.  Tr. at 380–81.

On May 23, 2006, Plaintiff visited Dr. Caddell's office, complaining of stress, panic attacks and trouble sleeping.  Tr. at 421.  She exhibited positive left straight leg raising and radiculopathy.  *Id.*  On August 8, 2006, Dr. Caddell noted that Plaintiff had a panic attack at work and was laid off.  Tr. at 420.

On September 28, 2006, Plaintiff visited the emergency department complaining of chronic right lower back pain radiating down her right leg.  Tr. at 402.  She stated that a leg spasm caused her to drive through her garage door that morning.  Tr. at 406–07.  A provider noted that Plaintiff ambulated normally and described her pain as a 10 out of 10.  Tr. at  407.  A view of her lumbar spine revealed no acute abnormality.   Tr. at 408.

After she hit the garage door, Plaintiff sought chiropractic treatment.  Tr. at 424–30.  She was noted to have a decreased range of motion in her cervical spine, thoracic

spine, lumbar spine, and sacroiliac joint; and muscle spasms in her trapezius, occipital, thoracic, lumbar, and hamstring muscles.  Tr. at 429.  Her affect was noted to be "flighty."  Tr. at 426.

On October 25, 2006, Plaintiff again visited the emergency department, complaining of right lower back pain that radiated down her leg and numbness in her feet.  Tr. at 374.  She stated that the pain worsened after driving back from Florida.  *Id.* On examination, her lower extremities were normal, and she displayed a normal gait and normal motor strength.  Tr. at 377.  She was assessed with chronic back pain and a narcotic/benzodiazepine addiction.  *Id.*  She was prescribed acetaminophen.  *Id.*

Also on October 25, 2006, Plaintiff saw Dr. Caddell and complained that her right leg had been hurting for three to four weeks and that her right foot was numb after driving back and forth to Florida.  Tr. at 419.  She also complained of left shoulder pain and incontinence.  *Id.*  She was in severe distress and was crying.  *Id.*  Dr. Caddell noted 18/18 tender points were inflamed, that a straight leg raise was positive on the right, and that Plaintiff was able to walk heel-to-toe.  *Id.*  He advised her to have an MRI and an EMG and prescribed Lortab, Flexeril, Lyrica, and Restoril.  Tr. at 418.

On November 1, 2006, Plaintiff underwent an MRI of her lumbar spine after complaining of incontinence.  Tr. at 197.  The MRI revealed moderate stenosis at the L4–5 disc, some disc disease, and a diffuse annular bulge at L2.  *Id.*

Plaintiff returned to Dr. Caddell on November 7, 2006.  Tr. at 269.  He noted a positive straight leg raise on the right and assessed Plaintiff with chronic back pain,

degenerative disc disease, foraminal stenosis, and osteoarthritis. *Id.* Dr. Caddell referred Plaintiff to a neurosurgeon. *Id.*

On November 18, 2006, Plaintiff visited the emergency department complaining of increased back pain after a fall at a restaurant. Tr. at 365. She stated that her symptoms were severe and were relieved by nothing. *Id.* On examination, she exhibited spinal tenderness, but a straight leg raising test was negative bilaterally. Tr. at 366. She was given an injection for pain and prescribed oxycodone. Tr. at 366–67.

On January 2, 2007, Dr. Carl Anderson reviewed Plaintiff's medical records and completed a physical residual functional capacity ("RFC") assessment. Tr. at 316–23. He opined that Plaintiff retained the ability to lift up to 20 pounds occasionally and 10 pounds frequently; to stand and/or walk for about six hours in an eight-hour day; and to sit for about six hours in an eight-hour day. Tr. at 317. Dr. Anderson opined that Plaintiff could only occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; and occasionally stoop and crawl. Tr. at 318. He also opined that Plaintiff should avoid concentrated exposure to hazards. Tr. at 320.

On February 20, 2007, Plaintiff underwent a consultative examination with Dr. Robert Moss. Tr. at 361–64. Plaintiff reported panic attacks, forgetting things, feeling sore, and feeling depressed all the time. Tr. at 361. Plaintiff also reported sleep difficulties, a loss of 45 pounds over the past six months, daily crying spells, feelings of worthlessness and guilt, and irritability, but denied suicidal thoughts. *Id.* Dr. Moss noted a head injury following a 2004 car accident, and Plaintiff stated that she noticed a very big change in her reading comprehension since the accident. Tr. at 361–62. Plaintiff

5

reported being hospitalized for a suicide attempt approximately seven months after her husband's death.  Tr. at 362.  She stated that she lived with her three children and that she cleaned, got take-out food, and paid bills, though sometimes she paid them late.  Tr. at 363.  She reported no social activities, apart from visiting her father in Virginia twice and taking her children to Atlanta during the prior year.  *Id.*  Her mood and affect were depressed and she was frequently tearful during the assessment.  *Id.*  Dr. Moss diagnosed Plaintiff with major depressive disorder (moderate to severe), cognitive disorder (not otherwise specified), and panic disorder without agoraphobia.  Tr. at 364.  He opined that Plaintiff had a significant impairment in social functioning and a mild impairment in independent functioning.  *Id.*

On March 8, 2007, Dr. Craig Horn reviewed the record and completed a mental RFC assessment and a psychiatric review technique ("PRT") form.  Tr. at 324–341.  Dr. Horn opined that Plaintiff had moderate limitations in the ability to understand, remember, and carry out detailed instructions; and the ability to interact appropriately with the general public.  Tr. at 324–25.  He opined that Plaintiff was able to understand, remember, and carry out very short, simple instructions.  Tr. at 326.  He stated that she would perform best in situations that do not require ongoing interaction with the public, but that she retained basic social skills.  *Id.*  He opined that she would respond appropriately to changes in the work setting.  *Id.*  He opined that Plaintiff had mild restriction of activities of daily living ("ADLs"); moderate difficulty in maintaining social functioning; moderate difficulty in maintaining concentration, persistence, and pace; and no episodes of decompensation of extended duration.  Tr. at 338.

On March 22, 2007, Plaintiff visited the emergency department after having been in a one-car accident trying to avoid a deer. Tr. at 175, 177. She stated that she had chronic back pain and was experiencing back pain and left knee pain. Tr. at 177. She denied pain upon walking. Tr. at 182. She displayed midline tenderness in her lower back and a normal range of motion in her lower extremities. Tr. at 184. She reported a history of panic attacks and depression, but denied suicidal thoughts. Tr. at 182, 188. Images of Plaintiff's lumbar spine revealed minimal spondylosis, but no fracture, no malalignment, no disc space narrowing, and no change since the 2006 imaging. Tr. at 193. Images of Plaintiff's cervical spine revealed no narrowing. Tr. at 193–94. A pelvic x-ray showed a nonfusion of the posterior elements of the lower sacrum. Tr. at 277. Plaintiff's initial drug screen detected cocaine in her system; however, the note indicated "[i]nterference is possible." Tr. at 188.

On April 30, 2007, Plaintiff visited Dr. Caddell and reported extreme fatigue. Tr. at 269. She stated that she had been nauseous the night before, that her daughter had been sick, and that she had washed her daughter's clothes and eaten oysters recently. *Id.*

Plaintiff returned to Dr. Caddell on August 22, 2007. Tr. at 167. He noted that her shoulders were grooved and she had severe ptosis of the breasts that was increasing her degenerative disc disease. *Id.* He noted 15/18 tender points. *Id.* Plaintiff stated that she had custody of her granddaughter. Tr. at 168. She stated that her Prozac had not been working, and Dr. Caddell noted the need for an increased dose. *Id.* On the same day, Dr. Caddell filled out a questionnaire about Plaintiff's mental health treatment. Tr. at 273. He stated that her thought process was racing and slowed; her thought content

was obsessive; and that she was worried/anxious, depressed, and withdrawn.  *Id.*  He opined that her attention/concentration was poor, as was her memory.  *Id.*  He stated that psychiatric care had been recommended, Plaintiff had moderate limitations in work related functions and that her slowed thinking, anxiety, and tendency to be withdrawn "severely affects work."  *Id.*

On November 14, 2007, Plaintiff saw Dr. Caddell and complained of a sore back. Tr. at 213.  She had a positive straight leg raise test.  *Id.*  Dr. Caddell assessed Plaintiff with fibromyalgia, degenerative disc disease, chronic back pain, anxiety, and depression. *Id.*  She was prescribed Fastin, MS Contin, Lortab, Klonopin, and Restoril.  *Id.*

Plaintiff next saw Dr. Caddell on Janurary 23, 2008, at which time she reported having lost nine pounds through diet and exercise.  Tr. at 212.  She complained of chronic back pain and said that MS Contin helped, but was expensive.  *Id.*  Dr. Caddell noted that Plaintiff was alert and in moderate distress.  *Id.*  He prescribed Lortab, Klonopin, Prozac, Flexeril, Restoril, and Phenergan.  *Id.*

On January 30, 2008, Plaintiff had a consultative examination with Randel Jones, Ph.D.  Tr. at 263–67.  Plaintiff stated that she was unable to maintain employment because of problems with concentration, lifting, and standing.  Tr. at 263.  She reported a history of back problems, head injury, sciatica, fibromyalgia, anxiety, depression, and sleep disturbance.  *Id.*  She stated that her daughter had a baby and that she had assumed custody of the child.  *Id.*  She reported trying to hang herself in 2002 while she was incarcerated.  *Id.*  Plaintiff stated that she cared for her children, performed light household chores, and was currently living with a friend and the friend's husband.  Tr. at

264.  Dr. Jones noted that Plaintiff was able to maintain attention and concentration during his examination.  Tr. at 265.  On examination, her memory for recent and remote information was intact.  *Id.*  Dr. Jones observed her to be in depressed mood, with an appropriate affect.  *Id.*  Based on testing, he opined that Plaintiff was of low average intelligence, and noted that she had some difficulty maintaining attention and concentration on testing.  *Id.*  He opined that she had marked levels of anxiety and depression.  Tr. at 266.  He assessed her with major depressive disorder versus dysthymia, anxiety disorder (not otherwise specified), somatization disorder, and borderline personality disorder.  *Id.*  He opined that Plaintiff had sufficient intellectual ability to perform routine, repetitive tasks.  *Id.*  He opined that Plaintiff was likely to be unreliable due to anxiety and depression, but would display appropriate behavior with peers and the public.  *Id.*

On January 31, 2008, Plaintiff participated in a sleep study at the Sleep Laboratory for Breathing Disorders at Hillcrest Hospital.  Tr. at 199.  She was referred for the study based on her complaints of excessive daytime sleepiness, loud snoring, and witnessed apneas.  *Id.*  She did not display sleep apnea, but had frequent respiratory arousals suggestive of Upper Airway Resistance Syndrome.  *Id.*  The provider encouraged Plaintiff to consider a trial of a CPAP machine to assist with sleep.  *Id.*

On February 7, 2008, Dr. Robbie Ronin reviewed the record and completed a mental RFC assessment and a PRT form.  Tr. at 222–25, 229–42.  Dr. Ronin opined that Plaintiff had moderate limitations in the ability to understand, remember, and carry out detailed instructions; the ability to interact appropriately with the general public; and the

9

ability to set realistic goals or make plans independently of others.  Tr. at 222–23.  He opined that Plaintiff was able to understand, remember, and carry out very short, simple instructions.  Tr. at 224.  He stated that Plaintiff had the ability to maintain attention and concentration for extended periods.  *Id.*  He stated that Plaintiff was not well-suited for meeting the demands of working with the general public, but that she could interact appropriately with coworkers and supervisors.  *Id.*  He opined that she had the ability to adapt to the basic demands of a work environment.  *Id.*  He opined that Plaintiff had moderate restriction of ADLs; moderate difficulty in maintaining social functioning; moderate difficulty in maintaining concentration, persistence, and pace; and no episodes of decompensation of extended duration.  Tr. at 239.

On March 7, 2008, Dr. Dale Van Slooten reviewed Plaintiff's medical records and completed a physical RFC assessment.  Tr. at 214–21.  He opined that Plaintiff retained the ability to lift up to 50 pounds occasionally and 25 pounds frequently; to stand and/or walk for about six hours in an eight-hour day; and to sit for about six hours in an eight-hour day.  Tr. at 215.  Dr. Anderson opined that Plaintiff could only occasionally climb ladders, ropes, or scaffolds.  Tr. at 216.  He further opined that Plaintiff should avoid concentrated exposure to hazards.  Tr. at 218.

On September 24, 2008, Plaintiff visited Dr. Caddell complaining of an extremely sore back.  Tr. at 156.  She reported that her pain in the prior month ranged from a 7/10 to a 9/10, but stated that medication provided 8/10 or 9/10 on a scale of relief (with 10/10 being complete relief).  Tr. at 163.

Dr. Caddell next examined Plaintiff on January 29, 2009.  Tr. at 153.  He reported 14/18 tender points upon examination.  Tr. at 156.  Plaintiff rated her pain as a 9/10 at best and noted that bad weather flared her pain.  Tr. at 157–58.  She also rated her nausea as 7/10, tiredness from medications as 9/10, and difficulty thinking as 10/10.  Tr. at 157.  She requested an increase in Prozac.  Tr. at 158.  Also on January 29, 2009, Dr. Caddell filled out a medical source statement.  Tr. at 159–61.  He opined that Plaintiff was limited to lifting less that 20 pounds occasionally or frequently; sitting 30 minutes at a time for a maximum of four hours in an eight-hour day; and standing for 20 minutes at a time for a total of two hours in an eight-hour day.  Tr. at 159.  He further opined that she could not climb stairs, perform work off the ground, perform overhead work, or engage in repetitive bending or stooping.  *Id.*  Dr. Cadell stated that Plaintiff would need to be able to sit or stand and take unscheduled breaks at her own discretion.  Tr. at 160.  He opined that her pain or other conditions (side effects, etc.) markedly interfered with her ability to concentrate and/or persist toward completion of a task, and markedly interfered with her ability to handle stress in a work environment and interact appropriately with employers, co-workers, or customers.  *Id.*  He stated that she could not operate heavy or hazardous machinery, could not operate a commercial vehicle, and could sometimes operate a personal vehicle.  *Id.*  He noted that Plaintiff's medications caused sedation, dizziness, nausea, constipation, and poor concentration.  *Id.*  Dr. Cadell opined that Plaintiff would miss 15 workdays per month due to her condition, her treatment, and the side effects of her treatment.  *Id.*  He further opined that, as of June 1, 2006, she was not able to work full time.

b.    Records After Plaintiff's Date Last Insured

On July 14, 2009, Plaintiff returned to Dr. Caddell.  Tr. at 152.  He noted that her anxiety had increased.  *Id.*  Plaintiff rated her pain as a 9/10 or a 10/10 at all times.  Tr. at 154.

On April 29, 2010, Plaintiff visited Dr. Caddell and reported that she had run out of her medications while she was in Florida.  Tr. at 578.  He noted that her shoulders were grooved.  Tr. at 580.

On September 8, 2010, Plaintiff visited Dr. Caddell and reported that her back hurt.  Tr. at 576.  Dr. Caddell noted that Plaintiff's breast problem caused neck and back pain.  *Id.*  Plaintiff indicated that her medications resulted in significant tiredness (7/10) and difficulty thinking (10/10).  Tr. at 577.

On September 14, 2010, Plaintiff visited the emergency department after attempting suicide.  Tr. at 550.  The provider noted that Plaintiff's suicide attempt was due to an acute stress reaction after multiple recent losses, including a miscarriage.  *Id.*  At the emergency department, Plaintiff expressed no terminal thoughts and stated that she believed she would get her family together.  *Id.*  She stated that having to send away her children, not being able to pay for her house, and having to leave the house where she was staying contributed to her stress reaction.  Tr. at 552.

Several days later, on September 20, 2010, Plaintiff visited a plastic surgeon regarding a breast reduction and was found to be a good candidate for the procedure.  Tr. at 581.

On November 17, 2010, Plaintiff visited Dr. Katherine T. Lewis at Hillcrest Family Practice, complaining of right knee pain after falling down stairs. Tr. at 531. An x-ray showed mild degenerative joint disease of the knee. *Id.* Dr. Lewis suspected a possible ligamentious inter-meniscal injury. *Id.*

Plaintiff had an MRI on her right knee on December 1, 2010. Tr. at 570–71. It showed a complete ACL tear. Tr. at 570. Dr. John H. Paylor noted that her knee was very unstable and interfered with her ADLs. Tr. at 573. On December 21, 2010, Dr. Paylor performed a right knee arthroscopy and an ACL repair. Tr. at 564–69.

On January 27, 2011, Plaintiff visited Dr. Caddell and reported that she would not be getting a breast reduction. Tr. at 575. The doctor again diagnosed Plaintiff with fibromyalgia, chronic neck and back pain, macromastia, and anxiety, and recommended a breast reduction due chronic to back pain. Tr. at 579.

On February 2, 2011, Plaintiff's surgeon noted that she had recovered nicely from her right knee surgery, but Plaintiff reported that her left knee was giving way. Tr. at 572. She exhibited left knee positive drawer and positive Lachman's signs, as well as a positive pivot shift. *Id.* Dr. Paylor noted that he would order an MRI of Plaintiff's left knee. *Id.*

C.      The Administrative Proceedings

1.      The Administrative Hearings

a.      First Hearing

At the hearing on July 16, 2009, Plaintiff testified that she last worked in early 2006, but was let go after two months because her supervisors said that she seemed like

13

she was always drugged up and could not concentrate. Tr. at 32–33. She said she kept missing things at her job and that the job made her irritable and caused her to have an anxiety attack. Tr. at 34. She stated that her worst problem was a lack of concentration and that she had panic attacks lasting about 15 minutes two or three times per week. Tr. at 37. She said she also experienced daily crying spells lasting about an hour. Tr. at 37–38. She testified that her fibromyalgia made her tired and made her whole body hurt. Tr. at 38. She described her back pain as a 10 on a 10-point scale. *Id.*

Plaintiff reported taking Flexeril, Lortab, and MS Contin. *Id.* She said her medications made her feel sick, agitated, tired, and nauseous. Tr. at 39. She estimated that she could sit and stand for three to four hours each in an eight-hour workday. Tr. at 41–42. She said she could not kneel or bend at the waist, frequently dropped things, and could not frequently lift more than ten pounds. Tr. at 43–44. She stated that she was only able to get about one and half hours of uninterrupted sleep per night. Tr. at 44–45.

### b.    Second Hearing

#### 1)    Plaintiff's Testimony

At the hearing on March 7, 2011, Plaintiff testified that she lived with her 10-year-old son, 14-year-old daughter, 22-year-old daughter, and 3-year-old granddaughter. Tr. at 589. She stated she last worked in March 2006 and lived on survivor benefits stemming from her husband's death in a car accident. Tr. at 589–90.

Plaintiff testified that her condition had gotten a lot worse since the first hearing. Tr. at 593. She reported having two surgeries and being hospitalized for attempting suicide between the hearings. *Id.* She stated she was scheduled to have another surgery

14

to replace the ACL in her left knee with a cadaver ligament.  Tr. at 594–95.  She testified that the pain in her right knee was a seven or eight on a 10-point scale and the pain in her left knee was an eight.  Tr. at 595.  She said her fibromyalgia made her hurt all the time, especially when she was stressed.  Tr. at 596.

When asked about her medications, Plaintiff stated that they made her feel "loopy."  Tr. at 595–96.  Because of that side effect, she said she no longer drove and had been pulled over three weeks prior to the hearing on suspicion of drunk driving.  Tr. at 596.  She stated that her fibromyalgia medication made her really aggravated.  *Id.* Plaintiff said she did not think she could perform a job that required her to interact with co-workers, managers, or customers because she would probably "end up in jail for going off on them."  Tr. at 596–97.  She stated that another side effect of her medications was forgetfulness.  Tr. at 597.

Plaintiff estimated that from March 2009 through the date of the second hearing, she could occasionally or frequently lift five pounds; sit for 20 to 25 minutes at a time; and stand or walk 30 minutes at a time.  Tr. at 597–98.  She stated that she spent most of her time lying down.  Tr. at 598.  She said her doctor told her she should not bend her right knee or climb stairs.  Tr. at 600.  She stated that she no longer cooked, did laundry, drove, shopped, or went out to eat because her oldest daughter had taken over those responsibilities.  Tr. at 601.  Plaintiff denied testing positive for cocaine in 2008.  Tr. at 601.

2)      Vocational Expert Testimony

Vocational Expert ("VE") G. Roy Sumpter reviewed the record and testified at the hearing. Tr. at 602. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could lift 50 pounds occasionally and 25 pounds frequently; sit, stand, or walk six hours in an eight-hour workday; occasionally push and pull with her lower extremities; occasionally climb, stoop, kneel, and crawl; never climb ladders, ropes, or scaffolds; and frequently balance and crouch. Tr. at 604–05. The ALJ further stated that the hypothetical individual must avoid concentrated exposure to hazards, could perform simple one–two step tasks, and could occasionally interact with the public. Tr. at 605. The VE testified that the hypothetical individual could not perform Plaintiff's PRW. *Id.* The ALJ asked whether there were any other jobs in the region or national economy that the hypothetical person could perform. *Id.* The VE identified the jobs of sweeper-cleaner, kitchen helper, and food service worker in a hospital. *Id.* The ALJ then presented a second hypothetical, which was identical to the first except the hypothetical individual was limited to lifting 20 pounds occasionally and 10 pounds frequently. Tr. at 606. The VE stated that the hypothetical individual could perform the jobs of bench assembler, final inspector, and office helper. *Id.*

The VE testified that an individual who did not show up for work on a timely basis or frequently left the workstation for minutes or hours would not be able to sustain competitive employment. Tr. at 607. Upon questioning by Plaintiff's counsel, the VE stated that an individual limited to the extent opined by Dr. Caddell on January 29, 2009, would not be able to find work in the regional or national economy. Tr. at 607–08. The

VE likewise stated that an individual who missed 15 days of work per month or required the ability to lie down at her own discretion would not have work available in the regional or national economy. Tr. at 609. In a final hypothetical, Plaintiff's counsel limited the hypothetical individual to lifting five pounds occasionally or frequently, sitting 20 to 25 minutes at a time, and standing for 30 minutes at a time. Tr. at 610. The VE stated that the individual could perform the sedentary jobs of printed circuit board assembler, ampoule sealer, and surveillance systems monitor. Tr. at 610–11.

2.     The ALJ's Findings

In his decision of April 27, 2011, the ALJ made the following findings of fact and conclusions of law:

1. The claimant last met the insured status requirements of the Social Security Act on March 31, 2009.
2. The claimant did not engage in substantial gainful activity during the period from her alleged onset date of January 1, 2006 through her date last insured (20 CFR 404.1571 *et seq.*).
3. Through the date last insured, the claimant had the following severe impairments: panic attacks/depression, fibromyalgia, degenerative disc disease and bilateral reconstructive knee surgery (20 CFR 404.1520(c)).
4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).
5. After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform reduced medium work as defined in 20 CFR 404.1567(c). I specifically find the claimant could have lifted and carried 50 pounds occasionally and 25 pounds frequently. She could stand, sit and walk for six hours of an eight hour workday. She could have occasionally pushed and pulled with her lower extremities. The claimant could have never climbed ropes, ladders and scaffolds. She could have occasionally climbed, stooped, crawled, and kneeled. She could have frequently balanced and crouched. She would have needed to avoid concentrated exposure to hazards. She could have performed simple, one-two step tasks, and could have only had occasional contact with the public.

6.  Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7.  The claimant was born on September 27, 1967 and was 41 years old, which is defined as a younger individual age 18–49, on the date last insured (20 CFR 404.1563).

8.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferrable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)).

11. The claimant was not under a disability, as defined in the Social Security Act, at any time from January 1, 2006, the alleged onset date, through March 31, 2009, the date last insured (20 CFR 404.1520(g)).

Tr. at 478–93.

II.  Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)  the ALJ erred in using the same medical summary in both of his decisions;

2)  the ALJ failed to consider all evidence in the record;

3)  the ALJ did not accord proper weight to the treating physician's opinion;

4)  the ALJ did not properly consider the side effects of Plaintiff's medications;

5)  the ALJ did not properly consider Plaintiff's subjective complaints; and

6)  the ALJ erroneously relied on flawed testimony from the VE.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. § 423(a).  Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions.  *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims).  An examiner must consider the following:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[1] (4) whether such

---

[1]  The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity.  20 C.F.R. § 404.1525.  If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment.  20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria."  20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

impairment prevents claimant from performing PRW;[2] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82–62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v.*

[2] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

*Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

        2.     The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be

affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

1.    Medication Side Effects

Plaintiff argues that the ALJ did not properly consider the evidence regarding the side effects of her medications. [Entry #16 at 18–20]. The Commissioner asserts that the ALJ adequately assessed the side effects from medication. [Entry #17 at 21–23].

In his decision, the ALJ referenced Plaintiff's testimony that her medications made her "loopy" and that she had stopped driving after being pulled over three weeks prior to the hearing for suspicion of driving under the influence. Tr. at 485. The ALJ stated that it seems inconsistent that Plaintiff would have driven a vehicle with knowledge of the alleged side effects and only stopped driving as a result of being stopped by a law enforcement officer. *Id.*

Later in the decision, the ALJ stated that Dr. Caddell refilled Plaintiff's medications consisting of MS Contin, Lortab, and Klonopin seven times, but the records on those dates are "devoid of any complaints of side effects." Tr. at 489. The ALJ notes that Plaintiff completed a disability report in which she listed her medications, but indicated that she did not experience any side effects from them. *Id.* The ALJ stated that he nevertheless accounted for the possibility of side effects in his RFC assessment by prohibiting Plaintiff from climbing ropes, ladders, and scaffolds and from concentrated exposure to hazards. *Id.*

The ALJ provided further discussion of the alleged side effects of Plaintiff's medications in his assessment of Dr. Caddell's opinion. Dr. Caddell stated that Plaintiff's medications caused sedation, dizziness, nausea, constipation, and poor concentration. Tr. at 160. The ALJ again noted that Plaintiff denied any medication side effects in a disability report and stated that Dr. Caddell had only listed drowsiness as a side effect of MS Contin. Tr. at 489. The ALJ further stated that none of Dr. Caddell's other reports indicated significant side effects to medication. *Id.* Finally, the ALJ stated, "[I]t is logical to assume that because [Dr. Caddell] repeatedly prescribed the same medications to the claimant, she never complained to him of any side effects of the medications." *Id.*

Plaintiff asserts that the ALJ's assessment of the side effects of her medications is factually wrong because the record shows that she reported side effects to Dr. Caddell on several occasions. [Entry #16 at 19–20]. The record supports Plaintiff's contention. On January 29, 2009, Plaintiff presented to Dr. Caddell and completed a questionnaire in which noted that her she was experiencing significant side effects from her medications. Tr. at 157. She rates her symptoms on a 10-point scale with zero being "barely noticeable" and 10 being "severe enough to stop medicine." *Id.* She rated vomiting, constipation, and lack of appetite as 2/10; nausea as 7/10; sweating as 8/10; fatigue as 9/10; and nightmares, difficulty thinking, and insomnia as 10/10. *Id.* This record directly contradicts the ALJ's finding that the medical records from the dates on which Dr. Caddell refilled Plaintiff's medications were "devoid of any complaints of side effects." Tr. at 489. Furthermore, Plaintiff completed the questionnaire on the same day that Dr. Caddell completed his statement that her medications caused sedation, dizziness, nausea,

constipation, and poor concentration.  Tr. at 160.  Thus, contrary to the ALJ's finding, Dr. Caddell's records listed more than just drowsiness as a side effect.

On July 14, 2009, after Plaintiff's date last insured, Dr. Caddell noted that Plaintiff's MS Contin was causing nausea.  Tr. at 152.  On September 8, 2010, Plaintiff likewise reported medication side effects to Dr. Caddell.  Tr. at 577.  She indicated that her medications resulted in significant tiredness (7/10) and difficulty thinking (10/10).  Tr. at 577.

In addition to Dr. Caddell's treatment notes, the record contains a document dated January 31, 2008, from the Sleep Laboratory for Breathing Disorders at Hillcrest Hospital.  Tr. at 199.  Plaintiff was referred there for a sleep study based on her complaints of excessive daytime sleepiness, loud snoring, and witnessed apneas.  *Id.* This record lends further support to Plaintiff's complaints of fatigue.

To the extent the ALJ relied on a single disability report indicating Plaintiff experienced no medication side effects, the undersigned concludes the report does not provide the substantial evidence necessary to support the ALJ's findings.  The report is undated and is internally inconsistent.  As the ALJ indicated, the report lists Plaintiff's medications and notes beside each medication that it does not cause side effects.  Tr. at 148.  However, the report also provides, "I take medication and my boss saying I was on drugs."  Tr. at 141.  The report also indicates that Plaintiff had to take a stool softener "because of the other medicine," but does not list constipation as a side effect of any of her other medications.  Tr. at 148.  In addition, there are other disability reports in the record that document medication side effects.  For example, a report dated March 18,

2008, indicates that Plaintiff's Lyrica, hydrocodone, and morphine caused drowsiness. Tr. at 105.  Another undated report states that Plaintiff's Extodac made her sick to her stomach and her Restoril made her sleepy.  Tr. at 118.

Because the ALJ's holdings with regard to Plaintiff's alleged medication side effects are contradicted by the record evidence, the undersigned is unable to determine whether the ALJ considered all evidence of record on this issue.  Consequently, the undersigned recommends remanding the matter to the ALJ for further consideration of the severity of the side effects of Plaintiff's medications and the impact the side effects have on her RFC.  Relatedly, the undersigned recommends directly the ALJ to reconsider his credibility determination and his decision to discount Dr. Caddell's opinion to the extent those findings were linked to his assessment of the side effects of Plaintiff's medications.

2.    VE Testimony

Plaintiff also contends that the three occupations identified by the VE were not in accordance with the RFC assessed by the ALJ.  [Entry #16 at 22–24].  The Commissioner responds that even assuming Plaintiff could not perform the jobs of kitchen helper and food service worker, nothing in her RFC conflicts with her ability to perform the job of sweeper-cleaner.  [Entry #17 at 26].

The job of industrial sweeper-cleaner requires driving an "industrial vacuum cleaner through designated areas, such as factory aisles and warehouses, to collect scrap, dirt, and other refuse."  *Dictionary of Occupational Titles* ("*DOT*"), 389.683.010, 1991 WL 673279.  Plaintiff argues that this job description is inconsistent with the RFC

provision requiring her to avoid concentrated exposure to hazards, which she contends would include the operation of an industrial, moving machine through an industrial setting. [Entry #16 at 23–24]. Plaintiff also briefly notes that driving an industrial machine may be inconsistent with her limitation to only occasional pushing and pulling with the lower extremities. *Id.* at 24. The Commissioner disputes that driving an industrial sweeper-cleaner constitutes a hazard and notes that the *DOT* description provides that a sweeper-cleaner would not be exposed to vibration, atmospheric conditions, moving mechanical parts, electric shock, high exposed places, radiation, explosives, toxic chemicals, or any other environmental conditions. [Entry #17 at 26 (citing *DOT*, 389.683.010)].

While the job of sweeper-cleaner does not involve the hazardous conditions identified by the Commissioner, it does require significant driving/operating. The alleged side effects of Plaintiff's medications call into question Plaintiff's ability to safely operate an industrial sweeper-cleaner. Therefore, in conjunction with the foregoing recommendation of remand to reconsider the side effects of Plaintiff's medications, the undersigned recommends remanding this matter for additional VE testimony based on the RFC the ALJ assesses on remand.

3.     Remaining Allegations of Error

In light of the foregoing recommendations related to the ALJ's incomplete consideration of Plaintiff's alleged medication side effects, Plaintiff's remaining allegations of error are not addressed. On remand, however, the undersigned recommends directing the ALJ to assess Plaintiff's credibility and Dr. Caddell's opinion

in accordance with the applicable regulations and the complete record regarding the alleged medication side effects.  The undersigned further recommends directing the ALJ to summarize all relevant medical information, but notes that not all evidence in the record is necessarily relevant.  The undersigned notes that the recommendations in this matter are in no way intended to suggest that the ALJ should award benefits on remand.

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law.  Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence.  Therefore, the undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of 42 U.S.C. § 405(g), that this matter be reversed and remanded for further administrative proceedings.

IT IS SO RECOMMENDED.

*Shiva V. Hodges*

May 19, 2014                                 Shiva V. Hodges
Columbia, South Carolina                     United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.  "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'"  *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see*  Fed. R. Civ. P. 6(a), (d).  Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).